**Lindburgh JACKSON, et al., Plaintiffs,**

v.

**The CITY OF AUBURN, ALABAMA, Defendant.**

**No. Civ.A. 97–T–1207–E.**

United States District Court,
M.D. Alabama,
Eastern Division.

Feb. 24, 1999.

Kyle T. Smith, Gordon, Silberman, Wiggins & Childs, Birmingham, AL, plaintiffs.

Randall C. Morgan, Hill, Hill, Carter, Franco, Cole & Black, Montgomery, AL, for defendant.

## MEMORANDUM OPINION

MYRON H. THOMPSON, District Judge.

Plaintiffs Lindburgh Jackson, Lieutenant Morris, and Nolan Torbert bring this lawsuit claiming that the City of Auburn, Alabama, discriminated against them on the basis of race in denying their application for a conditional-use permit to construct duplexes. The plaintiffs charge that the City violated their rights under the equal-protection clause of the fourteenth amendment to the United States Constitution, as enforced through 42 U.S.C.A. § 1983, and the Fair Housing Act of 1968, as amended, 42 U.S.C.A. §§ 3601 through 3631.[1] The plaintiffs have invoked the jurisdiction of the court pursuant to 28 U.S.C.A. §§ 1331 (federal question) and 1343 (civil rights) and 42 U.S.C.A. § 3613(a)(1)(A) (Fair Housing Act). This lawsuit is now before the court on the City's motion for summary judgment and the plaintiffs' motion to amend the complaint. For reasons to follow, the court will grant the motion for summary judgment and deny the motion to amend the complaint.

### I. SUMMARY–JUDGMENT STANDARD

Rule 56(c) of the Federal Rules of Civil Procedure provides that summary judgment is appropriate where "there is no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law." Once the party seeking summary judgment has informed the court of the basis for its motion, the burden shifts to the non-moving party to demonstrate why summary judgment would be inappropriate. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986); *see also Fitzpatrick v. City of Atlanta,* 2 F.3d 1112, 1115–17 (11th Cir.1993) (discussing how the responsibilities on the movant and the non-movant vary depending on whether the legal issues, as to which the facts in question pertain, are ones on which the movant or non-movant bears the burden of proof at trial). In making its determination, the court must view all evidence and any factual inferences in the light most

---

1. The plaintiffs initially also asserted claims pursuant to 42 U.S.C.A. §§ 1981 and 1982. In their Brief in Opposition to Summary Judgment (hereafter "Plaintiffs' Brief"), filed August 7, 1998, the plaintiffs informed the court of that they no longer wish to pursue those claims. *See* Plaintiffs' Brief at 8 n. 1.

favorable to the non-moving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986).

"The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient [to withstand summary judgment]; there must be evidence on which the jury could reasonably find for the plaintiff." *Earley v. Champion Int'l Corp.*, 907 F.2d 1077, 1080 (11th Cir.1990) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252, 106 S.Ct. 2505, 2512, 91 L.Ed.2d 202 (1986)).

## II. BACKGROUND

The facts, as garnered from the affidavits, deposition testimony, and other evidence submitted by the parties but viewed in the light most favorable to the plaintiffs, are as follows. Jackson, Morris, and Torbert are African–Americans and the sole stockholders in J.T.M. Enterprises, Inc. J.T.M. Enterprises owns a 1.97–acre parcel of property in a cul-de-sac at the north end of White Street in Auburn, Alabama. The property, which the court will hereinafter refer to as the White Street property, abuts single-family-home subdivisions on three sides and undeveloped land on the fourth side. The residents of one of the adjoining subdivisions, located on Cary Drive, are predominantly white. The property also abuts a single-family-home subdivision, located on Donahue Street, populated primarily by African–Americans.[2] There is no evidence of the racial makeup of White Street's residents. There are apartments and duplexes several blocks, or approximately a mile, from the White Street property.[3]

Jackson is a civic activist and advocate for the rights of African–Americans in Auburn.[4] Prior to the events at issue in this case, he had spoken before the City Council on repeated occasions about subjects including the establishment of a polling station in an African–American neighborhood and the creation of a park honoring Dr. Martin Luther King,[5] and had served on the City Council from 1976 to 1980.[6] Jackson is also a landlord who rents an apartment, a house, and two offices in Auburn.[7] He contends that African–American landlords generally have African–American tenants in Auburn.[8] However, he notes that he has had two or three white tenants in the ten years he has been renting the apartment.[9]

Prior to the events at issue in this case, the plaintiffs had no experience in developing property and had never presented an application to the Planning Commission.[10] J.T.M. Enterprises owns only the White Street property and was formed in order to purchase that property.[11]

J.T.M. Enterprises purchased the White Street property on May 2, 1996, at an auction at the Lee County Courthouse. According to the plaintiffs, several neighbors of the White Street property were at the auction.[12] All of the neighbors in at-

2. Plaintiffs' Evidentiary Submission in Opposition to Summary Judgment (hereafter "Plaintiffs' Evidentiary Submission"), filed August 7, 1998, exhibit 1 (deposition of Lindburgh Jackson) (hereafter "Jackson Deposition") at 88–90.

3. Plaintiffs' Evidentiary Submission, exhibit 4 (deposition of Nolan Torbert) (hereafter "Torbert Deposition") at 29.

4. Jackson Deposition at 167–68.

5. *Id.* at 152, 154–59.

6. *Id.* at 76.

7. *Id.* at 37–40.

8. *Id.* at 172–73.

9. *Id.* at 40.

10. Defendant's Motion for Summary Judgment (hereafter "Defendant's Motion"), filed July 2, 1998, exhibit A (deposition of Lindburgh Jackson) at 32, 43; Defendant's Motion, exhibit B (deposition of Nolan Torbert) at 10–11; Defendant's Motion, exhibit C (deposition of Lieutenant Morris) at 15–16.

11. Defendant's Motion, exhibit A (deposition of Lindburgh Jackson) at 31–34.

12. Jackson Deposition at 82; Torbert Deposition at 20–21.

tendance were white.[13] During the auction, Torbert and Morris heard some of the neighbors state that they would put their homes up for sale if the plaintiffs were to obtain the White Street property.[14]

When the plaintiffs purchased it, the White Street property was on land zoned as a Redevelopment District, that is, as "RDD."[15] Under the Auburn zoning ordinance, which was first instituted in 1984, duplexes were a "permitted" use in RDD zoning when the plaintiffs purchased the property; in other words, developers needed no special permit from the City in order to undertake such development.[16] In July 1996, two months after the plaintiffs purchased the property, the Auburn zoning ordinance was amended. The amendment changed duplexes from a "permitted" to a "conditional" use of RDD-zoned land, thereby requiring that developers obtain a conditional-use permit from the City Council in order to build multi-family housing on land so zoned.[17] Since the amendment, developers applying to build structures classified as conditional uses have had to submit two documents to the City. First, they have to submit a plat, which is a detailed drawing and map describing the planned development, for preliminary and final approval by the Auburn Planning Commission. Plat approval appears to turn on providing certain information and may be granted conditioned upon future full compliance. Developers must also submit an application for conditional-use approval to the Planning Commission,

which recommends that the application be approved or rejected. The City Council thereafter automatically reviews conditional-use applications and approves or rejects them. Conditional-use approval turns on a determination that the proposed building will not harm the community and complies with the goals of the zoning ordinance.

Prior to submitting the plaintiffs' application to the City, Jackson canvassed residents on Donahue Street, which runs through the primarily African–American, single-family-home neighborhood adjoining the White Street property, to ask if anyone opposed his building duplexes on White Street. He heard no opposition.[18] He also consulted with a City employee for help with the application and assistance in complying with subdivision regulations.[19]

On December 2, 1996, the plaintiffs submitted an application for preliminary plat approval and recommendation of conditional-use approval to the Auburn Planning Commission. The application detailed the plaintiffs' planned development of a total of seven duplexes and triplexes on the White Street property and, according to Jackson, was in full compliance with the applicable ordinances.[20] The City Engineer and the City Planning Director found numerous engineering and plat deficiencies in the application.[21]

The plaintiffs' application was first considered by the Auburn Planning Commission at its January 9, 1997, meeting. At that meeting, Jackson spoke in favor of the proposal, and several other citizens spoke

13. *Id.* at 21.

14. *Id.* at 20–21; Plaintiffs' Evidentiary Submission, exhibit 5 (deposition of Lieutenant Morris) (hereafter "Morris Deposition") at 36.

15. Jackson Deposition at 57. Sometime after the plaintiffs applied for permission to develop the property, the zoning was changed to "NC–9," or "Neighborhood Conservation District." However, because the plaintiffs had submitted their application before the zoning change was approved, the City considered the application under the rules applying to RDD-zoned land.

16. Defendant's Response to Plaintiffs' Opposition to Summary Judgment, filed September

17, 1998, attachment (affidavit of Kelly Templin) (hereafter "Second Templin Affidavit") at 1–2.

17. *Id.*

18. Jackson Deposition at 91–92.

19. *Id.* at 87.

20. *Id.* at 179.

21. Defendant's Motion, exhibit E (affidavit of Kelly Templin) (hereafter "First Templin Affidavit") at 1–2 and exhibits B and C thereto.

in opposition to the proposal. Some of these opponents were the same neighbors of the property who, at the auction where the plaintiffs had purchased the property, had expressed their intention to move if the plaintiffs purchased the property.[22] The neighbors' asserted reason for opposing the plaintiffs' application was that the proposed duplex development would not be compatible with the surrounding neighborhood.[23] Clarence Morgan, an African-American, also spoke in opposition to the plaintiffs' application. Morgan stated that he opposed the duplexes because they would cause increased traffic flow and because he felt that the area should continue to have only single-family homes.[24] On a motion by Al Davis, an African-American Planning Commission member, to recommend denial of the application, the Commission rejected the plaintiffs' application by a vote of seven to zero.[25] Davis stated that "the intent was that this area be preserved in a residential fashion."[26]

On January 21, 1997, the plaintiffs' application was reviewed by the Auburn City Council. Again there was opposition from members of the public, including some of the same neighbors who had spoken against the proposal at the Planning Commission meeting.[27] The City Council denied the application,[28] explaining that the proposed development was not compatible with the surrounding neighborhood.[29] The Council also issued a written resolution denying conditional-use approval. In the resolution, the Council took notice of the Planning Commission's recommendation to deny the request "because it is not in compliance with all City ordinances and regulations and will have adverse impacts on the community" and stated that the Council had held a public hearing and found that "the request was inconsistent with the standards set forth for conditional uses in ... the Zoning Ordinance and that the request will have an adverse impact on the general health, safety, and welfare of the community."[30]

The plaintiffs point to the following developments in Auburn as evidence of the City's preferential treatment of white developers:

- Center Point Estates is a duplex project currently under construction by a white developer on land zoned RDD and surrounded by duplexes and apartments.[31] On October 10, 1996, the Planning Commission approved the request for preliminary and final plat approval and recommended that the City Council grant conditional-use approval subject to the project's meeting certain specified conditions.[32] The plaintiffs contend that Center Point Estates lacks required setbacks from the property lines.[33]

- The City approved a conditional-use permit for a white developer to build the Northern Village Subdivision, although the permit expired and a subsequent application to develop the property was later

---

22. Jackson Deposition at 136.

23. Defendant's Motion, exhibit A (deposition of Lindburgh Jackson) at 141.

24. *Id.* at 138.

25. First Templin Affidavit at 2.

26. *Id.*

27. Jackson Deposition at 150–51.

28. During a conference with the court on February 24, 1999, the City informed the court that six of the eight members of the City Council, along with the mayor, voted against the plaintiffs' application, while one councilmember abstained, and the final councilmember was absent. The member who abstained was the only African-American on the Council; the other members and the mayor were white.

29. Torbert Deposition at 32; Morris Deposition at 47; First Templin Affidavit; Plaintiffs' Evidentiary Submission, exhibit 3 (Auburn Planning Commission documents) (hereafter "Planning Commission Documents") at 243.

30. *Id.* at 3.

31. Second Templin Affidavit at 3.

32. Planning Commission Documents at 223.

33. Jackson Deposition at 207.

rejected. The developer applied to the Planning Commission for preliminary plat approval and recommendation of conditional-use approval to build a 70-lot subdivision of duplexes on land zoned "comprehensive development district/development district housing." The proposed development abutted a mobile-home park and would not have abutted any land zoned for a conventional single-family-home subdivision.[34] However, it would have abutted one single-family home. On November 14, 1996, the Planning Commission voted to approve the preliminary plat and recommend conditional-use approval subject to the developer meeting certain conditions.[35] The project did not have 50-foot setbacks.[36]

• The Willows Apartments is an apartment complex in RDD zoning built by a white developer. The complex lies within a subdivision containing duplexes and apartments and is located on a corner lot adjacent to and across the street from multi-family housing.[37] The developer received approval for the project from the Planning Commission and the City Council in April 1997. The plaintiffs contend it lacks a proper setback.[38]

• The Halal Subdivision project is an eight-lot duplex subdivision in RDD-zoned land built by a white developer.[39] It is in a neighborhood primarily composed of single-family homes occupied by African–Americans.[40] The developer submitted an application for plat approval, but not conditional-use approval, in 1995.[41] Although the plaintiffs contend that the development was a conditional use at the time it was built,[42] the application was presented prior to the 1996 amendment of the zoning ordinance that rendered duplexes a conditional use.[43] The plaintiffs contend that it lacks the proper side and rear setbacks.[44]

• Fox Run Subdivision/Lacosta Circle is a duplex development developed by a white person on RDD-zoned land.[45] It is surrounded by single-family homes occupied predominantly by African–Americans.[46] Although the plaintiffs contend that it was a conditional use when built,[47] its site plan was approved by the Auburn City Council and Planning Commission and it was built in 1977.[48] They also contend that it lacks a 50-foot setback.[49]

• The College Arms, an apartment complex at 835 North Gay Street in RDD zoning, was built in 1975 and is surrounded by single-family homes occupied predominantly by African–Americans.[50] The plaintiffs do not know who the developer was.[51] Jackson is "pretty sure" that conditional-use approval was required when it was built because "in RDD they have the same requirements."[52] The plaintiffs also believe that it lacks proper setbacks.[53]

**34.** Second Templin Affidavit at 3.

**35.** Planning Commission Documents at 206.

**36.** Jackson Deposition at 208.

**37.** Second Templin Affidavit at 4.

**38.** Jackson Deposition at 208.

**39.** *Id.* at 166.

**40.** *Id.* at 183.

**41.** Planning Commission Documents at 205.

**42.** Jackson Deposition at 183.

**43.** Second Templin Affidavit at 3.

**44.** Jackson Deposition at 184.

**45.** *Id.* at 142, 185; Planning Commission Documents at 245 (map of Fox Run subdivision showing Lindburgh Jackson's property behind subdivision); Second Templin Affidavit at 2.

**46.** Jackson Deposition at 184.

**47.** *Id.* at 185.

**48.** Planning Commission Documents at 245; Second Templin Affidavit at 2.

**49.** Jackson Deposition at 185.

**50.** *Id.* at 186; Second Templin Affidavit at 2.

**51.** Jackson Deposition at 187.

**52.** *Id.* at 187.

**53.** *Id.* at 188.

● The Mimosa Place Apartments, in the same predominantly African–American neighborhood as the College Arms, were developed in 1983, prior to the enactment of the zoning ordinance.[54] The plaintiffs contend that the project required conditional-use approval but does not know who developed it.[55] The plaintiffs also contend it lacks proper setbacks.

● Hearthwood Apartments, a complex at 449 North Donahue Drive, is in RDD zoning, was built by a white developer prior to 1992.[56] It abuts a single-family African–American home and an apartment complex.[57] The plaintiffs contend it lacks setbacks.[58] The developer applied for site-plan approval of an expansion which was considered and approved by the Auburn Planning Commission on April 11, 1996.[59]

The City has approved three projects proposed by African–American developers since July 1996. In April 1997, an African–American applicant applied to develop duplexes in RDD zoning. The Planning Commission recommended approval of the project, and the City Council granted a conditional-use permit.[60] In May 1997, Jackson's son applied for and received approval from both the Planning Commission and the City Council for a conditional-use permit to develop a duplex in RDD-zoned land.[61] In September 1997, the Planning Commission and City Council approved an African–American developer's application to build twelve apartments in another type of zoning.[62] There is no evidence as to the racial makeup of or type of housing comprising the surrounding communities.

The plaintiffs filed this federal lawsuit on August 11, 1997, alleging that the City of Auburn discriminated against them because they are African–Americans and because the City assumed their future tenants would be African–Americans. They further argue that the City regularly allows the construction of multi-family housing in neighborhoods composed of single-family homes occupied predominantly by African–Americans, but rejects proposals to build multi-family homes in neighborhoods of single-family homes occupied predominantly by whites.

## III. MOTION FOR SUMMARY JUDGMENT

The City of Auburn contends that it is entitled to summary judgment on both of the plaintiffs' claims because they lack standing and, even if they have standing, they cannot establish the other essential elements of their claims. The City also argues that because Jackson filed for bankruptcy after filing the complaint in this case, his claims are no longer viable. As the basis for its standing argument, the City notes that J.T.M. Enterprises, rather than the individual plaintiffs, is the owner of the White Street property. The City accordingly submits that only J.T.M. Enterprises has standing to challenge the City's actions. The court will not address the City's standing or bankruptcy arguments because, assuming for the sake of argument that the individual plaintiffs have standing and that Jackson's claim proceeds notwithstanding his bankruptcy petition, the plaintiffs have not presented

**54.** Second Templin Affidavit at 2.

**55.** Jackson Deposition at 188–89.

**56.** *Id.* at 210; Planning Commission Documents at 236. The transcript of the Auburn Planning Commission meeting reveals that the expansion plan had been previously submitted and approved in May 1992.

**57.** Jackson Deposition at 210; Planning Commission Documents at 236.

**58.** Jackson Deposition at 210.

**59.** Planning Commission Documents at 235.

**60.** Second Templin Affidavit at 4.

**61.** *Id.* It is perplexing that, in their complaint filed three months after Jackson's son received approval to develop land in Auburn, the plaintiffs contend that they are the only African–American developers working in Auburn.

**62.** *Id.*

evidence sufficient to establish the elements of their equal-protection or Fair Housing Act claims.

## A. EQUAL PROTECTION

The plaintiffs claim that the City denied them equal protection in violation of the fourteenth amendment to the United States Constitution by discriminating against them on the basis of their race and on the basis of the assumed race of their future tenants.

■ There are three categories of equal-protection claims. *E & T Realty v. Strickland,* 830 F.2d 1107, 1112 n. 5 (11th Cir.1987), *cert. denied,* 485 U.S. 961, 108 S.Ct. 1225, 99 L.Ed.2d 425 (1988). The first type is a claim that a statute discriminates on its face. *Id.* The second type of equal-protection claim is that neutral application of a facially neutral statute has a disparate impact. *Id.* The third type of claim is that defendants are unequally administering a facially neutral statute. *Id.* The plaintiffs' claim falls into the third category.

To prove their equal-protection claim, the plaintiffs must show (1) that the City treated them differently from similarly situated persons, and (2) that the City unequally applied its zoning laws for the purpose of discriminating against them. *GJR Inv., Inc. v. County of Escambia,* 132 F.3d 1359, 1367 (11th Cir.1998) (citing *Snowden v. Hughes,* 321 U.S. 1, 6, 64 S.Ct. 397, 401, 88 L.Ed. 497 (1944); *Strickland v. Alderman,* 74 F.3d 260, 264 & n. 4 (11th Cir.1996)); *E & T Realty,* 830 F.2d at 1109–1114. Because the court finds that the plaintiffs have not presented evidence sufficient to support a finding that the City treated them differently from similarly situated individuals or intentionally discriminated against them, the court will grant summary judgment for the City as to the plaintiffs' equal-protection claim.

### 1. Similarly Situated Individuals

There are two ways in which a developer could be similarly situated to the plaintiffs. First, a developer could have sought a conditional-use permit to build multi-family housing on land surrounded by single-family-home subdivisions in RDD-zoned land. Second, a developer could have submitted an application for conditional-use approval that failed to comply with applicable ordinances to the same extent as the plaintiffs' application, yet was approved. None of the developers cited by the plaintiffs fits either of these descriptions.

■ Both of these methods of proof require that the plaintiffs' comparators sought conditional-use approval in order to construct their projects. It is undisputed that duplexes did not become a conditional use in RDD zoning until July 1996 and that most developments cited by the plaintiffs were constructed prior to 1996 (the Halal Subdivision, the College Arms Apartments, the Mimosa Place Apartments, the Fox Run Subdivision/Lacosta Circle, and the Hearthwood Apartments). The only evidence suggesting that permits were required for these buildings is Jackson's apparently unsupported deposition testimony that these projects were conditional uses at the time they were built.[63] However, Jackson's allegation, unsupported by personal knowledge, that conditional-use approval was required is not sufficient to establish a genuine issue of material fact as to whether the developers of those projects were required to obtain conditional-use permits. "Mere conclusions and unsupported allegations are legally insufficient to create a dispute to defeat summary judgment." *Bald Mountain Park, Ltd. v.*

---

63. The lack of support for Jackson's deposition testimony is evidenced by his comment with respect to the College Arms apartments, which was built in 1975, that he was "pretty sure" that conditional-use approval was required when it was built because "in RDD they have the same requirements." Jackson Deposition at 187. Jackson apparently had not considered that, because of changes in the zoning laws, he could not assume that all buildings in land currently zoned RDD were subject to the same requirements applicable to projects currently under construction in RDD-zoned land.

*Oliver*, 863 F.2d 1560, 1563 (11th Cir. 1989). Thus, those development projects that were constructed prior to 1996 are not similarly situated.

The developers of three projects—Center Point Estates, Northern Village Subdivision, and the Willows Apartments—obtained a conditional-use permit. However, to be similarly situated, a developer would, like the plaintiffs, had to have sought approval to build multi-family housing on property surrounded by single-family-home subdivisions. The plaintiffs have pointed to no such developers. The developer of Center Point Estates applied for a conditional-use permit to build duplexes on property surrounded by duplexes and apartments, not conventional subdivisions. The developer of Northern Village applied for a conditional-use permit to build duplexes on a property abutting a mobile-home park.[64] The plaintiffs offer evidence that Northern Village would have abutted one single-family home. However, the presence of one single-family home adjacent to the property does not render the developer similarly situated to the plaintiffs. The mobile-home park suggests that the City allowed a variety of housing types at the location of the proposed project. The developer of the Willows Apartments applied to build apartments on a piece of property lying within a subdivision containing duplexes and apartments and situated adjacent to and across the street from multi-family housing. None of these developers was similarly situated to the plaintiffs in terms of the locations in which they sought to build.

Although the City claims it rejected the plaintiffs' application because of their proposal's incompatibility with its surroundings, the City also could have relied, in part, on the plaintiffs' lack of compliance with City ordinances to deny their application.[65] Thus, the City's treatment of others whose applications were not in compliance with all applicable ordinances is also relevant. The evidence reflects that the Planning Commission granted preliminary plat approval and recommendation of conditional-use approval to the Northern Village Subdivision and Center Point Estates, and that it approved the preliminary plat for the Halal Subdivision despite noncompliance with certain requirements.[66] The developers of these projects are not similarly situated because the type and level of noncompliance distinguishes the individuals who submitted these applications from the plaintiffs.

When the plaintiffs submitted their application, the City Engineer and City Planning Director found a number of significant flaws in it. Among other deficiencies, the plaintiffs' application lacked engineering plans for water, drainage, erosion, sewers, and streets, had not met requirements for electricity and gas, and was missing five different types of plat information.[67] None of the other applications was any-

---

**64.** Northern Village was not in RDD zoning and is therefore not similarly situated for that reason as well.

**65.** The City mentioned the plaintiffs' application's noncompliance with City ordinances in its written resolution denying the plaintiffs' application.

**66.** The record also reveals that the Planning Commission approved a site plan for an expansion of the Hearthwood Apartments, for which it had already approved a nearly identical site plan in 1992. *See* Planning Commission Documents at 235–36. However, given the record before the court, the court cannot compare the Planning Commission's action with respect to the Hearthwood Apartments expansion with its action in the instant case. The developers of the Hearthwood Apartments submitted a site plan detailing plans to expand a pre-existing apartment complex. This is a project of a distinctly different nature than building a new subdivision. There is no indication that the Hearthwood developers applied for conditional-use approval or plat approval. Nor is there any information before the court to indicate whether the standards for approving site plans for pre-existing developments are the same as those for approving plats or conditional-use applications. Thus, the plaintiffs have not presented evidence that the developer of the Hearthwood Apartments expansion is similarly situated.

**67.** First Templin Affidavit at 2 and exhibits B and C thereto.

where near as deficient in these seemingly fundamental areas.

When the Planning Commission granted approval of Northern Village Subdivision's preliminary plat and recommended conditional-use approval, it noted that the approval was subject to erosion-control measures being noted on the plat and variances being granted on turning radiuses and the distance between the intersection of two roads.[68] The want of a marking on the plat and the granting of a variance for the streets are not comparable to missing basic plans. The Planning Commission also granted preliminary and final plat approval and recommended conditional-use approval of Center Point Estates subject to on-site retention and drainage being in place before the start of development, and changing the name of two streets on the plat.[69] In comparison with the plaintiffs' application, there is no indication that the Center Point Estates developer failed to provide basic plans. There is also evidence that the Halal Subdivision's preliminary plat was approved with conditions and that, when presented for final plat approval, "[s]ome conditions of preliminary plat approval ha[d] not been met," including required references about buffyards and landscaping, specifying the pool and common area as being for residents only, and addressing maintenance of the common area.[70] These deficiencies simply are not comparable to those in the plaintiffs' application. Thus the plaintiffs have presented no evidence of similarly situated individuals whom the City treated differently. Because "[d]ifferent treatment of dissimilarly situated persons does not violate the equal protection clause," *E & T Realty,* 830 F.2d at 1109, the plaintiffs' equal-protection claim must fail.

### 2. Intentional Discrimination

 Even if the plaintiffs had provided evidence that the City treated similarly situated white developers differently, the plaintiffs could not withstand summary judgment on their equal-protection claim. "Proof of racially discriminatory intent or purpose is required to show a violation of the Equal Protection Clause." *Village of Arlington Heights v. Metropolitan Hous. Dev. Corp.,* 429 U.S. 252, 265, 97 S.Ct. 555, 563, 50 L.Ed.2d 450 (1977) (citing *Washington v. Davis,* 426 U.S. 229, 96 S.Ct. 2040, 48 L.Ed.2d 597 (1976)). The plaintiffs have not presented evidence sufficient to establish the existence of a genuine issue of material fact as to whether the City intentionally discriminated against them.

The plaintiffs seek to prove intentional discrimination in three different ways. First, they attempt to show that the City engaged in a pattern of disparate enforcement of zoning ordinances based upon the racial makeup of the neighborhood. Second, they offer evidence that, in rejecting the plaintiffs' application, the City was responding to the racially motivated opposition of certain constituents. Third, they attempt to show that the City's stated reasons for denying the plaintiffs' application were untrue. However, none of these approaches succeeds in establishing a genuine issue of material fact as to intentional discrimination.

### a. Disparate Enforcement

 The plaintiffs first attempt to prove intent to discriminate by arguing that the City has engaged in a pattern of disparate enforcement of zoning ordinances. According to their theory, inten-

---

**68.** Planning Commission Documents at 206. The Planning Director raised a question as to whether the proposal complied with, and what the proper interpretation should be of, the resource protection standards. It is unclear whether these questions were ever resolved.

**69.** *Id.* at 223. The public hearing notice stated that one lot did not meet dimensional

requirements and said that the adjustments should be made prior to final plat approval. *Id.* at 203. Later, at the time of the public hearing, the Planning Director announced that all lots were in compliance with dimensional requirements. *Id.* at 226.

**70.** *Id.* at 205.

tional discrimination is demonstrated by the fact that the City has repeatedly granted permission to build duplexes amongst single-family homes occupied by African–Americans, but did not grant the plaintiffs permission to build their duplex project in an area adjoining a subdivision of single-family homes occupied predominantly by whites. The plaintiffs also contend that the City unequally enforces the requirement that duplexes and apartments built next to single-family homes be set back 50 feet from the property line.

The evidence before the court does not bear out the plaintiffs' contentions. The record reveals only that there are several duplex subdivisions in neighborhoods now composed primarily of single-family homes occupied by African–Americans. However, the simple fact of the existence of multi-family housing in the midst of single-family housing currently occupied by African–Americans is inconclusive; it does not prove that the City is more favorably disposed toward allowing construction of multi-family housing in African–American than in white single-family-home neighborhoods. For most of the duplex subdivisions and apartments cited by the plaintiffs, there is no evidence in the record indicating that the developer had to obtain conditional-use approval to build the duplexes. If the City's approval was not required, the fact that the projects were built is not probative of the City's intent to discriminate. Nor is there any evidence in the record that the land upon which these duplexes and apartments were built was surrounded by single-family homes occupied by African–Americans at the time of construction. Without such evidence, the fact that the buildings currently stand amongst homes occupied by African–Americans does not prove that the City engaged in unequal application of zoning laws. Thus, the court has no evidence before it showing that the City allows multi-family homes to be built in African–American neighborhoods of single-family homes but not in white neighborhoods of single-family homes.

The plaintiffs also contend that the City unequally enforces the requirement that duplexes and apartments built next to single-family homes be set back 50 feet from the property line. The record does not support this contention either. In 1994, the zoning ordinance was amended to require 50–foot setbacks whenever performance subdivisions, a category consisting primarily of various types of multi-family housing, were built next to conventional subdivisions, a category consisting of parcels of land divided into lots for single-family homes.[71] The plaintiffs have presented evidence that several duplexes and apartment buildings lack 50–foot setbacks and that those buildings are located in neighborhoods of single-family homes currently occupied by African–Americans. However, in no case have the plaintiffs presented evidence that 50–foot setbacks were required by law at the time of construction, that the complexes abut conventional subdivisions as defined by the ordinance, that the surrounding single-family homes existed at the time of construction, and that African–Americans occupied the surrounding homes at the time of construction. Thus, the plaintiffs have not shown that the City unequally enforces the setback requirement and have not established a genuine issue of material fact as to whether the City unequally applied its zoning laws on account of race.

### b. Racially Motivated Opposition

■ As their second method of proving intentional discrimination, the plaintiffs offer evidence to show that the City's rejection of the plaintiffs' application was in response to the racially motivated opposition of certain constituents. "If . . . a zoning board's response to political pressure amounts to implementation of local residents' discriminatory impulses, then the board's actions may give rise to a cause of action for intentional discrimina-

---

**71.** Second Templin Affidavit at 1 and exhibit A thereto; Additional Submission in Support of Defendant's Motion for Summary Judgment, filed November 3, 1998.

tion." *Bryant Woods Inn, Inc. v. Howard County*, 911 F.Supp. 918, 930 (D.Md.1996), *aff'd*, 124 F.3d 597 (4th Cir.1997). In *United States v. Yonkers Bd. of Educ.*, 837 F.2d 1181, 1225 (2d Cir.1987), *cert. denied*, 486 U.S. 1055, 108 S.Ct. 2821, 100 L.Ed.2d 922 (1988), the Second Circuit explained the factors by which intentional discrimination may be proved under this theory. "In order to demonstrate a city's racially discriminatory intent, it is sufficient to show that the decision-making body acted for the sole purpose of effectuating the desires of private citizens, that racial considerations were a motivating factor behind those desires, and that members of the decision-making body were aware of the motivations of private citizen[s]." *Id.*

■ The plaintiffs cannot meet their burden under the *Yonkers* test. The record does contain evidence from which a jury could find that the City acted to effectuate the views of its constituents. There was public opposition to the plaintiffs' proposal at both the Planning Commission and City Council hearings. There is evidence suggesting that the City tended to grant approvals where there was no opposition and deny them when there was opposition.[72] There is also evidence suggesting that some of the citizens who spoke at those public hearings were motivated by racial animus.[73] However, the plaintiffs have presented no evidence to meet the third prong of the *Yonkers* test—that the City knew that the public's opposition was racially motivated.

The record is devoid of any evidence suggesting that the City knowingly implemented the racist views of its constituents. There is no evidence that any member of the City Council or Planning Commission was at the auction at which the White Street property's neighbors made allegedly racist comments or that any City official

otherwise learned of the comments made there. The people who spoke in opposition to the plaintiffs' application at the public hearings made no racially derogatory remarks and stated only that they felt that the plaintiffs' proposed project was not in character with the surrounding neighborhood and that it could cause traffic problems. Furthermore, although most of the opponents of the project were white, at least one opponent was an African–American and he gave a similar reason to that given by the white neighbors for their opposition to the project. Under these circumstances, the City cannot be held to have known that the white opponents of the plaintiffs' application were motivated by racial animus. Thus, the plaintiffs have not presented evidence sufficient to support a finding that the City intentionally discriminated against them.

#### c. False Reasons

Finally, the plaintiffs attempt to show intentional discrimination by offering evidence that the City lied about its stated reasons for denying the plaintiffs' application. The City contends that it denied the plaintiffs' application because of the proposed project's incompatibility with the surrounding neighborhood. The plaintiffs contend that the City also relied on the plaintiffs' failure to comply with City ordinances. In support of their contention that the compliance justification was pretextual, the plaintiffs offer evidence that their application complied with the setback requirements of the zoning ordinance.

The plaintiffs' focus on compliance with setback requirements is puzzling. There is no evidence suggesting that the plaintiffs' application was denied for failure to comply with setback requirements, and indeed the City claims that it never considered whether the plaintiffs' proposal com-

---

**72.** *See* Second Templin Affidavit at 2–4 (noting the presence or lack of public opposition to various project applications and the City's corresponding action).

**73.** According to the plaintiffs, some of the people who spoke at the public hearings

against approval of the plaintiffs' project had earlier said they might have to move if the plaintiffs purchased the property. These comments could be interpreted by a reasonable jury as indicators of racial animus.

plied with the setback requirement. Thus, the plaintiffs' compliance with the setback requirement is irrelevant.

As for other statutory requirements, the City has presented evidence detailing numerous technical deficiencies in the plaintiffs' application.[74] The only evidence the plaintiffs have presented to dispute the truth of these deficiencies is Jackson's unexplained and unsupported assertion in his deposition testimony that the plaintiffs' application was in compliance with the City ordinances. However, as noted earlier, unsupported allegations are legally insufficient to create a dispute to defeat summary judgment. *See Bald Mountain Park, Ltd. v. Oliver*, 863 F.2d at 1563. The plaintiffs also note that other projects received conditional approval despite noncompliance with various regulations. As discussed earlier, the deficiencies in those projects simply are not comparable to the failings in the plaintiffs' application.

The plaintiffs also contend that the City falsely claimed that it was denying the plaintiffs' application because of the incompatibility of their proposed project with the surrounding neighborhood of single-family-home subdivisions. In support of this argument, the plaintiffs present undisputed deposition testimony that there are apartments and duplexes within several blocks, or approximately one mile, of the White Street property.

This evidence is insufficient to save the plaintiffs' case from summary judgment. Were the evidence that the plaintiffs' proposed project abutted land developed with buildings other than single-family homes, there would be a genuine issue of material fact as to whether the proposed project was incompatible with the surrounding neighborhood. However, it is undisputed that the White Street property lies at the end of a cul-de-sac surrounded on three sides not just by single-family homes, but by subdivisions of single-family homes. Moreover, the plaintiffs offer no evidence that the City normally uses an area with a radius of three blocks or one mile in determining compatibility with the surrounding neighborhood. Under these circumstances, the plaintiffs' evidence therefore proves only that they disagree with their potential neighbors and the City about the compatibility of their project with the surrounding single-family homes. Standing alone, a mere disagreement simply is not enough overcome the plaintiffs' summary-judgment burden. The court therefore will grant summary judgment as to the plaintiffs' equal-protection claim.

## B. FAIR HOUSING ACT

The plaintiffs also claim that the City violated their rights under the Fair Housing Act of 1968, which states that it is "unlawful ... [t]o make unavailable or deny, a dwelling to any person because of race." 42 U.S.C.A. § 3604(a). Discriminatory application of zoning laws is actionable under § 3604. *See, e.g., Baytree of Inverrary Realty Partners v. City of Lauderhill*, 873 F.2d 1407 (11th Cir. 1989) (Fair Housing Act claim was stated under § 3604 by real-estate developer against county for failure to grant application to amend zoning ordinance). Under the Fair Housing Act, the plaintiffs must prove either disparate treatment or disparate impact. *See, e.g., Gamble v. City of Escondido*, 104 F.3d 300, 304 (9th Cir. 1997); *LeBlanc–Sternberg v. Fletcher*, 67 F.3d 412, 425 (2nd Cir.1995), *cert. denied*, 518 U.S. 1017, 116 S.Ct. 2546, 135 L.Ed.2d 1067 (1996); *Cavalieri–Conway v. L. Butterman & Assoc.*, 992 F.Supp. 995, 1002 (N.D.Ill.1998). Here the plaintiffs proceed under a disparate-treatment theory. Thus they must prove that the City intentionally discriminated against them on the basis of race. *See LeBlanc–Sternberg*, 67 F.3d at 425.

When weighing evidence of intentional discrimination in Fair Housing Act cases, the three-part burden-of-proof test developed in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), applies. *See Secre-*

---

74. *See* First Templin Affidavit at 2 and exhibits B and C thereto.

*tary, United States Dept. of Hous. and Urban Dev. v. Blackwell,* 908 F.2d 864, 870 (11th Cir.1990). First, the plaintiff has the burden of proving a prima-facie case of discrimination. *See Id.* Second, if the plaintiff sufficiently establishes a prima-facie case, the burden shifts to the defendant to articulate a legitimate, nondiscriminatory reason for its action. *See Id.* Third, if the defendant satisfies this burden, the plaintiff must prove that the legitimate reasons asserted by the defendant are in fact pretext for illegal discrimination. *See Id.*

In *Gamble v. City of Escondido,* a case involving a claim that a city racially discriminated against an applicant for a conditional-use permit, the Ninth Circuit applied the following formulation of a prima-facie case of racial discrimination: (1) that the plaintiff is a member of a protected class; (2) that the plaintiff applied for a conditional-use permit and was qualified to receive it; (3) that the permit was denied despite the plaintiff's being qualified; and (4) that the defendant approved a conditional-use permit for a similarly situated person, outside the protected class, during a period relatively near the time the defendants denied the plaintiff's permit request. 104 F.3d at 305 (citations omitted) [75].

■ Applying the *Gamble* formulation, the court finds that the plaintiffs have not presented a prima-facie case of intentional discrimination under the Fair Housing Act. It is undisputed that the plaintiffs are members of a protected class and that they applied for a conditional-use permit. Whether the plaintiffs were qualified for approval is more problematic. As discussed above, there is evidence in the record that the plaintiffs' application suffered from technical deficiencies. The evidence before the court also establishes that the Planning Commission grants recommendations of approval and the City Council grants conditional-use approvals despite some technical deficiencies in applications,

conditioned on correcting those deficiencies. However, as discussed above, there is no evidence that the City had approved an application with the scope and type of deficiencies that blemished the plaintiffs' application. Thus the plaintiffs have not established that they were qualified for approval. Nor can the plaintiffs meet the fourth prong of the *Gamble* test, that the City granted permits to similarly situated individuals. As discussed in the analysis of the plaintiffs' equal-protection claim, they have not presented evidence sufficient to support a finding that other similarly situated applicants received conditional-use permits. Thus, under the *Gamble* standard, the plaintiffs have not provided evidence sufficient to establish a prima-facie case of discrimination.

Furthermore, even if the plaintiffs had established a prima-facie case, they have not produced evidence sufficient to establish a genuine issue of material fact as to pretext. *See Grigsby v. Reynolds Metals Co.,* 821 F.2d 590, 596 (11th Cir.1987) ("plaintiff may not in all cases merely rest on the laurels of [his] prima facie case in the face of powerful justification evidence offered by the defendant"). The City offers a legitimate, nondiscriminatory justification for denying the plaintiffs' application: that the proposed duplex development was incompatible with the surrounding single-family home subdivisions. Under *McDonnell Douglas,* once the defendant has articulated a legitimate justification for its action, "the burden shifts back to the plaintiff to 'introduce significantly probative evidence showing that the asserted reason is merely a pretext for discrimination.'" *Zaben v. Air Prod. & Chem., Inc.,* 129 F.3d 1453, 1457 (11th Cir.1997) (citation omitted). The plaintiffs can prove pretext in one of two ways: indirectly, by showing that the defendant's proffered justifications are not true, or, directly, by showing that the defendant was more likely motivated by ra-

---

75. In *Gamble,* the Ninth Circuit does not state that the similarly situated person has to be outside the protected class. However, this additional requirement is obvious if there is to be an inference of discrimination.

cial animus than by its proffered reasons. *See Texas Dept. of Community Affairs v. Burdine,* 450 U.S. 248, 256, 101 S.Ct. 1089, 1095, 67 L.Ed.2d 207 (1981).

The plaintiffs have not established a genuine issue of material fact as to pretext by either method. As discussed earlier, although the plaintiffs disagree with the City's assessment of the compatibility of their project with the surrounding single-family homes, the only evidence they offer to support their position is testimony that there are multi-family homes several blocks away. However, without evidence that the City ordinarily considers more than the immediately surrounding area when determining compatibility, the existence of such buildings several blocks away does not prove that the City's proffered reason was not true.

Nor have the plaintiffs offered evidence sufficient to support a finding that the City was more likely motivated by race than by its proffered reason. The evidence relevant to this issue is the same evidence that the court considered as evidence of intentional discrimination in analyzing the plaintiffs' equal-protection claim. As discussed in that analysis, the plaintiffs have not presented the significantly probative evidence of pretext required to survive summary judgment. Therefore, the court will grant summary judgment for the City as to the plaintiffs' Fair Housing Act claim.

### IV. MOTION TO AMEND

In an effort to address the City's contention that they do not have standing, the plaintiffs filed a motion to amend the complaint to add J.T.M. Enterprises, Inc., as a plaintiff. The defendants opposed the motion as untimely and prejudicial.

As discussed above, even assuming for the sake of argument that the plaintiffs have standing, they have not presented evidence sufficient to withstand summary judgment as to their equal-protection or the Fair Housing Act claims. The addition of J.T .M. Enterprises as a plaintiff will not change the result. Thus, the court will deny the plaintiffs' motion to amend.

### V. CONCLUSION

Because the plaintiffs have failed to present evidence sufficient to establish a genuine issue of material fact as to either their equal-protection or Fair Housing Act claims, the court will grant the City's motion for summary judgment and will deny the plaintiffs' motion to amend. An appropriate judgment will be entered.